Anthony P. VOCCIO, Edward J. Cataldo, Robert M. Sweeney, Donald E. Hallam, David J. De Robbio, Michele Rossi, Ann D'Ettore, Robert M. Lamoureaux, Plaintiffs,

and

George Pistorio, Intervenor–Plaintiff,

v.

GENERAL SIGNAL CORPORATION; United Steelworkers of America, Local 5299; United Steelworkers of America, Defendants.

Civ. A. No. 88–0450 P.

United States District Court,
D. Rhode Island.

March 8, 1990.

Dennis J. Tente, Cranston, R.I., for plaintiffs.

Clare T. Jabour, Providence, R.I., for intervenor-plaintiff.

Robert W. Lovegreen, Providence, R.I., for defendant General Signal.

Richard M. Peirce, Providence, R.I., Rudolph L. Milasich, Jr., Pittsburgh, Pa., for defendant United Steelworkers.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Plaintiffs [1] worked for BIF, a subsidiary of General Signal Corporation (the "company") and were members of Local 5299 of the United Steelworkers of American (the "union"). They claim that the company breached its contract with the union by not granting them severance pay when it closed down its plant in West Warwick, Rhode Island and that the union breached its duty of fair representation in negotiating and approving an agreement governing severance pay and the plant closure and in choosing to negotiate rather than arbitrate over severance pay. The parties have substantially completed discovery; defendants now move for summary judgment, claiming that no genuine issues of material fact exist and they are entitled to judgment as a matter of law. This Court agrees and grants their motion.

## I. FACTS

The plaintiffs had left their jobs with BIF because of workplace injuries and were receiving workers' compensation as of September, 1987. On September 1, General Signal sent a letter to its employees at the BIF plant, notifying them that it planned to phase out the West Warwick facility over the next six months. The Union and Company entered into extensive bargaining over a shutdown agreement to modify the collective bargaining agreement under which the parties operated.

---

**1.** "Plaintiffs" include the intervenor George Pistorio, because his claims do not significantly differ from those of the named plaintiffs.

The collective bargaining agreement[2] contained a severance pay clause that stated:

In the event of the permanent closing of the Company's plant ..., an employee *whose job is eliminated* shall be entitled to severance allowance in accordance with and *subject to the following provisions and conditions:*

A) Employees shall be eligible for and shall receive severance pay in the amount of one (1) week of pay for each year of seniority service between five (5) and twenty-five (25) years.... *The rate for calculating severance allowance shall be the average hourly straight time earnings of the employee during the past twelve (12) calendar months.*

Collective Bargaining Agreement § 24.01(A) [hereinafter "CBA"] (emphasis added). Employees who had been laid off for more than six months "shall have no rights to severance pay." *Id.* § 24.01(D)(4). The parties were free to amend the agreement as long as the amendment was "in writing and signed by the parties." *Id.* § 25.01.

When the Company and Union first met to bargain over the shutdown, the Company proposed that severance pay be restricted to those employees on active duty as of September 1, 1987. The Union rejected the Company proposal because it left union members on long-term disability, workers' compensation (such as plaintiffs), and layoff ineligible for severance pay. It presented a counterproposal that would include those employees in any severance pay award. The Company did not agree to the Union proposal; the two sides negotiated over that and other issues until February, 1988.

After five months of bargaining, the Union decided to present the slightly revised Company proposal (the "Memorandum of Agreement" or "MOA") to its membership for a vote. The Memorandum granted severance pay to employees on the active pay-roll as of September 1, 1987, and any others who returned to work by December 1, 1987. See MOA ¶ 1. The MOA included a list of eligible employees and stated that severance pay would be "based on the employee's rate of pay in effect on September 1, 1987." *Id.* ¶ 2(B).

When the union members met on February 25 to discuss the Company offer, the union leadership and counsel recommended rejecting it, in part because it did not provide severance pay for those employees on workers' compensation *or* layoff. Most of the plaintiffs attended the meeting and spoke out against the closedown agreement. Despite their views, and the views of the union hierarchy, the members of the Local, by a vote of 61–27, accepted the Memorandum. The union signed the Memorandum the next day.

When the BIF plant closed down in March, General Signal provided severance pay to eighty employees; the plaintiffs were among those who did not receive severance pay. Employees on workers' compensation were not the only group of employees denied severance pay, however; those employees the company had laid off also did not receive such pay.

## II. SUMMARY JUDGMENT STANDARD

The standard for summary judgment is well known, but it bears repeating within the context of this case. This Court grants summary judgment to General Signal and the Union because, construing all factual inferences in plaintiffs' favor, no genuine issue of material fact exists as to any of the plaintiffs' claims *and* the defendants are entitled to "judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). Some factual disagreement does exist in this case, but no dispute as to a central issue rises to the level sufficient to avoid summary judgment:

[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

2. BIF and the Union signed the three-year collective bargaining agreement that controls this    dispute in 1987.

motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510.

Plaintiffs fail in this case because they have not presented enough evidence to convince this Court that "a rational factfinder [would] resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). As the First Circuit recently reiterated, "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limits differing versions of the truth which a factfinder must resolve." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989), *quoted in Medina–Munoz*, at 8. Regardless of how sympathetic the plaintiffs' claims may be, this Court has little choice but to grant defendants' motion for summary judgment, given that the plaintiffs have never moved beyond the skeletal in their allegations and proof.

### III. THE UNION'S DUTY OF FAIR REPRESENTATION

The plaintiffs argue that the Union did not do all it could to protect their interests during the negotiations over the BIF plant shutdown and that the Union openly discriminated against them on the basis of their handicaps because it signed an agreement that denied them severance pay. The Union's actions, in their minds, breached its duty to represent them fairly.

The duty of fair representation is a union member's protection against the tyranny of the union majority. Inherently in a union democracy the views and desires of the minority will be subordinated to those of the majority. "In establishing a regime of majority rule, Congress sought to secure to all members of the [bargaining] unit the benefits of their collective strength and bargaining power, in full awareness that the superior strength of some individuals or groups might be subordinated to the interest of the majority." *Emporium Capwell Co. v. Western Addition Community Org.*, 420 U.S. 50, 62, 95 S.Ct. 977, 984–85, 43 L.Ed.2d 12 (1975) (footnote omitted). Recognizing the potential abuse that could result from majority rule, courts have long required union representatives "to make an honest effort to serve the interests of all of [the union] members, without hostility to any." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953); *see also Steele v. Louisville & N.R.R.*, 323 U.S. 192, 201–02, 65 S.Ct. 226, 231–32, 89 L.Ed. 173 (1944) (representative has "duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them").

▪ Holding a union to a duty of fair representation does not prohibit it, as the plaintiffs here seem to believe, from compromising the interests of some of its members during negotiations.

Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented.... Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. *A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.*

*Ford Motor Co.*, 345 U.S. at 338, 73 S.Ct. at 686; *see also Humphrey v. Moore*, 375 U.S. 335, 349, 84 S.Ct. 363, 371–72, 11 L.Ed.2d 370 (1964) (union does not breach duty of fair representation "in taking a good faith position contrary to that of some

individuals whom it represented nor in supporting the position of one group of employees against that of another."). Given the latitude a court grants to a union negotiator, the plaintiffs' burden in proving a breach of the duty of fair representation is heavy: They can succeed only if they show the union acted in an "arbitrary, discriminatory, or ... bad faith" manner in negotiating the closedown agreement. *E.g.*, *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967); *Condon v. Local 2944*, 683 F.2d 590, 594 (1st Cir. 1982).

◼ The plaintiffs argue that because they were receiving workers' compensation, they were handicapped and because the Union signed a shutdown agreement that denied severance pay to employees on workers' compensation, the Union discriminated against them as handicapped employees. Plaintiffs' claim fails for several reasons. First, the Union made an honest, good faith effort to obtain severance pay for them through the negotiations over the shutdown agreement. Although plaintiffs concede that the Union counterproposal during those negotiations granted them severance pay and that the Union bargained over the issue with General Signal, they allege that the Union could have done more to secure severance pay for them. Unfortunately, plaintiffs offer no proof to support their allegation. Even if they had, however, this Court, absent evidence of bad faith, would not intrude on the negotiating freedom of the Union representative by dictating a certain level of enthusiasm for a specific negotiating position. Moreover, any evidence plaintiffs could produce would have to defeat the clear evidence of the Union leadership's good faith: its support of the workers' compensation employees during negotiation and its recommendation

at the February 28 meeting that the membership reject the Company proposal, in part because it denied severance pay to employees on workers' compensation.[3]

◼ Second, even if this Court accepts *arguendo* that plaintiffs are handicapped, the plaintiffs have failed to prove that the Union discriminated against them *because of* their afflictions.[4] No direct proof exists that the Union discriminated against the plaintiffs. The circumstantial evidence is sketchy at best. Plaintiffs claim that the Union, when the 1987 CBA came up for a vote, failed to present to the members two proposals, eventually included in the 1987 contract, that specifically affected employees on workers' compensation. *Compare* 1984 CBA § 15.02 (granting employees who suffered workplace injuries indefinite leaves of absence) *with* 1987 CBA § 15.02 (restricting leaves of absence for employees injured on the job to one year or one half of their accrued seniority (not to exceed five years)). *Compare* 1984 CBA § 14.07 (allowing workers' compensation employees to accrue seniority during the full extent of their leaves) *with* 1987 CBA § 14.07 (allowing workers' compensation employees to accrue seniority only until their leaves of absence reach the lesser of "1) five years, or 2) the greater of one year or one-half of [their] accrued seniority at commencement of the period of absence"). Whether the union leadership presented the amendments to the two sections to the membership is a disputed question. In his deposition, union president D'Errico originally stated that the leadership presented the 1987 amendments to §§ 15.02 and 14.07 to the membership, but later admitted he could not remember whether they had been presented. Even if this Court accepts that

3. The plaintiffs' allegation that the Union position was a sham, because the Union knew that the members would accept the proposal regardless of a recommendation to reject, remains unsupported by any evidence. This Court cannot therefore accept it.

4. Plaintiffs' attack on the Memorandum fails for the same reason. An amendment to a collective bargaining agreement is valid unless it contradicts the terms of the agreement or federal law.

Plaintiffs correctly state that Rhode Island and federal law prohibit discrimination on the basis of a person's handicap. Had they proven the Union and company in drafting the Memorandum discriminated against them because of their disability, the Memorandum would be invalid. But they have not presented enough evidence to create a genuine issue of discrimination. The Memorandum, signed pursuant to the terms of the 1987 CBA, is therefore valid.

the amendments were not presented to the membership, as it must, and that the union action during the ratification of the 1987 contract was based on a discriminatory attitude towards workers' compensation employees, there is not enough evidence to produce a *genuine* issue as to the union's alleged discrimination in negotiating and signing the closedown agreement. Arrayed against that lone example of union misfeasance is the union leadership's behavior during negotiations and in front of the membership at the February meeting. In addition, defendants make a credible argument that the plaintiffs did not receive severance pay under the closedown agreement because of their work status, not because they were handicapped. Other groups of employees who were not on the active payroll, such as those laid off, also did not receive severance pay.

■ The plaintiffs alternatively complain that the union breached its duty of fair representation because it choose to negotiate a closedown agreement rather than force General Signal to arbitrate the issue of severance pay. The Union responds that it did not pursue arbitration because it did not feel that employees on workers' compensation had a right under the 1987 CBA to severance pay; the Union concluded arbitration would be futile and time consuming.[5]

The short answer to the plaintiffs' argument is that under the collective bargaining agreement, only employees can initiate the grievance and arbitration process. *See* 1987 CBA § 16. Plaintiffs have provided no evidence that they, or any other employees, attempted to grieve the plant shutdown before the closedown agreement was signed. The Union, therefore, had no power under the contract to arbitrate the shutdown on its own volition.

■ Even if plaintiffs had overcome that procedural hurdle, however, they have not produced a genuine issue as to whether the Union breached its duty of fair representation in choosing negotiation over arbitration. When a Union refuses to arbitrate a member's grievance, it breachs its duty of fair representation if "the employee's action is meritorious and ... 'arbitrary or bad-faith conduct on the part of the Union in processing his grievance' has occurred." *Kissinger v. United States Postal Service,* 801 F.2d 551, 553 (1st Cir.1986) (per curiam) (quoting *Vaca v. Sipes,* 386 U.S. at 193, 87 S.Ct. at 918).

■ The Union in this case did not breach its duty by "declin[ing] to put forward an interpretation of the collective bargaining agreement which [it] reasonably believed was incorrect." *Early v. Eastern Transfer,* 699 F.2d 552, 557 (1st Cir.), *cert. denied,* 464 U.S. 824, 104 S.Ct. 93, 78 L.Ed.2d 100 (1983). The Union did not believe plaintiffs were entitled to severance pay under the 1987 CBA because they did not have jobs eliminated by the plant shutdown and did not have any straight time earnings during the twelve months preceding the shutdown. As to plaintiffs Cataldo and Voccio, there can be little question that their job had been eliminated. They had been on workers' compensation long enough that at the time of the plant closing, their job classification had been eliminated. *See* Deposition of Edward Cataldo at 16; Deposition of D'Errico at 94–95. Under § 14.18, if an employee's job classification is eliminated, his job is abolished. *See* 1987 CBA § 14.18. For the other plaintiffs and intervenor, the issue is not so easily resolved. This Court does not have to do so, however, because none of the plaintiffs save one had any straight time earnings in the twelve months preceding the plant shutdown. By the plain language of § 24, "the rate for calculating severance allowance shall be the average hourly straight time earnings of the employee during the past twelve calendar months." If

5. Plaintiffs attempt to impeach the Union claim by arguing that the Union justification for not pursuing arbitration contradicted its stance during negotiations over a closedown agreement. This Court sees no conflict between the two positions. The Union could have, in good faith, interpreted the 1987 collective bargaining agreement as excluding workers' compensation employees from severance pay and, with that in mind, proposed an amendment to the 1987 CBA during the closedown negotiations to provide severance pay to those employees.

an employee has no such earnings, he cannot receive severance pay.

More importantly, however, plaintiffs have not shown that the Union acted arbitrarily or in bad faith in proceeding to negotiation instead of arbitration over severance pay. They must produce "considerably more than conclusions or a 'skeletal set of bland allegations'" to avoid summary judgment on the issue of the Union's bad faith. *Berrigan v. Greyhound Lines, Inc.*, 782 F.2d 295, 299 (1st Cir.1986) (quoting *Dewey v. University of New Hampshire*, 694 F.2d 1, 4 (1st Cir.1982), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983)). This Court recognizes that the standard for summary judgment is particularly stringent when questions of intent or bad faith exist. *See, e.g., Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir.1988). Even when defendants' intent is involved, however, the plaintiffs "opposing a motion for summary judgment must present sufficient probative evidence to convince the court that genuine, material factual issues remain to be resolved by the trier of fact." *Mendez v. Belton*, 739 F.2d 15, 20 (1st Cir.1984). This Court "is not obliged to find that a genuine issue of material fact exists where the only evidence of such an issue is a series of conclusory statements unsupported by specific factual allegations." *Velazquez v. Chardon*, 736 F.2d 831, 833–34 (1st Cir. 1984). The best argument the plaintiffs in this case can produce is that the Union chose the "easiest, most inexpensive way out" by attempting to negotiate a closedown agreement. They do not produce any evidence as to how the Union acted arbitrarily or in bad faith. Allegations alone do not suffice at the summary judgment stage.

## IV. GENERAL SIGNAL'S BREACH OF CONTRACT

The Company argues that it did not breach the collective bargaining agreement with the Union by not providing severance pay to plaintiffs because plaintiffs were not entitled to such pay under the 1987 CBA or the closedown agreement that amended the 1987 agreement. As this Court stated above, a reasonable interpretation of the plain language of § 24 of the 1987 CBA is that all but one plaintiff was not entitled to severance pay.

■ The closedown agreement was a valid amendment to the 1987 CBA, however. It comported with the terms of the 1987 CBA and did not violated Rhode Island or federal law, *see supra* note 4. It did not provide severance pay to any plaintiff. The Memorandum being effective, the company did not breach any obligation by following the agreement's clear language. Summary judgment for General Signal is appropriate. *See Vaca*, 386 U.S. at 186–87, 87 S.Ct. at 914–15; *Berrigan*, 782 F.2d at 300.

## V. CONSPIRACY CLAIMS AGAINST THE UNION AND GENERAL SIGNAL

■ Plaintiffs claim that the company and union conspired to deprive them of their rights under the contract. This Court is without jurisdiction to entertain this conspiracy claim. *See Kaylor v. Crown Zellerbach, Inc.*, 643 F.2d 1362, 1368 (9th Cir. 1981); *Russom v. Sears, Roebuck & Co.*, 558 F.2d 439, 441 n. 3 (8th Cir.), *cert. denied*, 434 U.S. 955, 98 S.Ct. 481, 54 L.Ed.2d 313 (1977); *Abrams v. Carrier Corp.*, 434 F.2d 1234, 1253–54 (2d Cir.1970), *cert. denied*, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971); *Berard v. General Motors Corp.*, 493 F.Supp. 1035, 1042 (D.Mass.), *aff'd mem*, 657 F.2d 261 (1st Cir.1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981). Even if this Court could consider the employees' allegations, it would have to grant summary judgment to defendants because plaintiffs do no more than present skeletal arguments to support their claim. Under the employees' expansive view of conspiracy, the simple negotiation between the company and union, compelled by the law governing collective bargaining, would give rise to a conspiracy claim by any disgruntled union member. This Court cannot accept such a proposition, which would chill the willingness of the parties to bargain and agree and therefore intrude upon the par-

ties' legally mandated duties. Moreover, as *Abrams* recognized, the employees' conspiracy claims are no different from their other claims against the union and company. "The allegation of 'conspiracy' is nothing more than a makeweight which adds nothing to the substance of the allegations against the individual defendants." *Abrams*, 434 F.2d at 1254.

## CONCLUSION

For the above reasons, this Court grants defendants' motions for summary judgment.